541 So.2d 128 (1989)
CITY OF WINTER HAVEN, a Florida Municipal Corporation, Appellant,
v.
Elaine ALLEN, As Personal Representative of the Estate of Waymon D. Allen, On Behalf of the Estate and the Survivors, Elaine Allen and Clinton Carl Allen, Appellee.
No. 87-3425.
District Court of Appeal of Florida, Second District.
March 17, 1989.
*129 Clifford J. Schott of Schott & Dale, P.A., Lakeland, for appellant.
Robin Gibson of Gibson & Lilly, Lake Wales, for appellee.
Robert A. Butterworth, Atty. Gen., and Louis F. Hubener, Asst. Atty. Gen., Tallahassee, amicus curiae on behalf of the State of Fla.
CAMPBELL, Chief Judge.
Appellant, City of Winter Haven, appeals the final judgment against it awarding appellee, the personal representative of the estate of Waymon Allen, damages in the amount of $600,000. Appellant carried liability insurance in the amount of $1,000,000. The jury found appellant liable for the May 29, 1986 shooting incident in which Polk County Sheriff's Deputy Waymon Allen was struck by a shot that was fired by a Winter Haven police officer during a sheriff's department drug raid in Winter Haven. We find that the trial court correctly held that the case of Avallone v. Board of County Commissioners of Citrus County, 493 So.2d 1002 (Fla.), on remand, 497 So.2d 934 (Fla. 5th DCA 1986), rather than the subsequently enacted chapter 87-134, Laws of Florida (1987), amending section 768.28, Florida Statutes (1985), prevailed as to the collectability of any judgment against appellant. We will discuss that issue in more detail later.
Appellant raises three other issues in this appeal. We find we must reverse and remand for a new trial on the ground that the trial court erred in directing a verdict against appellant on the issue of comparative negligence and by failing to give appellant's requested jury instruction regarding the justifiable use of force standard found in section 776.05, Florida Statutes (1985). We find that appellant's other two issues, the trial court's directed verdict against appellant on its section 440.11, Florida Statutes (1985) affirmative defense of worker's compensation immunity on a "borrowed servant" theory, and the alleged denial of its constitutional right to a fair trial, are both without sufficient merit to warrant our discussion.
The facts reveal that on May 29, 1986, Polk County Sheriff's Deputy Allen obtained a search warrant for one room of a rooming house in Winter Haven. That afternoon, Allen contacted the Winter Haven Police Department and requested one or more of their officers to come to the briefing to be held before the drug raid that evening. The city provided Officers Kirkland and Clouse.
Sergeant Hart was the supervisor for the sheriff's department in charge of the raid and Allen was the case agent. Allen advised the team members that other people could be inside the house. Allen had knowledge that a suspect inside the premises might be armed with a .357 magnum.
As part of the plan, a confidential informant made a drug buy and then informed Hart and Allen that the suspect had a female companion with him. Although the officers had established at the briefing the *130 order in which they would enter the rooming house, upon arriving, Allen entered first without waiting to verify if Officers Kirkland and Clouse were in position at the rear of the house as had apparently been the plan. Kirkland and Clouse had been issued Polk County Sheriff's Department radios so that they could be in communication with Hart. As Allen entered the house, a large black man began to run down the hall toward the rear of the house and was pursued by Sheriff's Officer Davilla.
A later taped statement by Allen indicated that the door to the suspect's room in the house opened almost immediately after Davilla began pursuing the other fleeing man. The suspect waved what appeared to be a long stick at Allen. Allen shot his revolver twice at the suspect. Deputy Russo, who was behind Allen, testified that he did not know what caused Allen to fire his weapon. The suspect retreated back into his room. Hart advanced up the hall toward the suspect's room and asked who was doing the firing. He received no answer, but heard three more shots. Allen later stated that he fired these shots without being in visual contact with the suspect.
Meanwhile, Officers Kirkland and Clouse had approached the house from a side street. They were not yet in their preplanned position at the rear of the house when they heard the shots fired from inside. They entered the rear of the house to attempt to assist. They saw Hart who, having received no answer to his earlier question and having heard three more shots, thought he was under fire from the suspect or an accomplice and began running, dodging and weaving down the hall toward the rear of the house. Because of Hart's zigzagging down the hall, Kirkland and Clouse believed that he had either been shot or was dodging bullets. Kirkland grabbed Hart and forced him to the ground, and to protect himself and the others, Clouse fired his shotgun once down the hall toward a muzzle flash at the front of the house. This shot apparently struck Allen.
It was first thought by members of the raid team that Allen had been shot by the suspect, and there was a disputed issue of fact at trial as to who shot Allen.
Several months after the raid, Allen returned to work and assumed his duties at the sheriff's department. Less than a year later, on March 15, 1987, Allen was fishing in a boat with a neighbor when he fell backward into the water and died.
Before Allen died, he had filed a personal injury suit based on the shooting. After Allen died, the trial court permitted appellee, Allen's personal representative, to refile his pending personal injury suit as a wrongful death action.
During the subsequent trial on the wrongful death action, both sides presented expert testimony as to Allen's cause of death. The jury, in awarding appellee $600,000 in damages, obviously agreed with appellee's expert that the cause of death was cardiac arrest caused by a brain lesion or bruise resulting from the gunshot wound Allen received when Clouse fired his shotgun down the hall of the house.
Appellee pursued her wrongful death action against appellant on the basis of the waiver of sovereign immunity statute, section 768.28, Florida Statutes (1985). The jury returned its verdict against appellant in the amount of $600,000 in November 1987. Appellant's liability insurance in the amount of $1,000,000, exceeded the maximum exposure limitations of section 768.28. At the time Allen was shot and at the time appellee filed her wrongful death action, the holding of the supreme court in Avallone would have permitted appellee to collect any judgment rendered in her behalf for damages caused by appellant up to the $1,000,000 liability limits of appellant's policy. The Florida Supreme Court held in Avallone that "purchase of tort liability insurance by a government entity, pursuant to section 286.28, constitutes a waiver of sovereign immunity up to the limits of insurance coverage and that this contingent waiver is independent of the general waiver in section 768.28." Avallone, 493 So.2d at 1004, 1005.
*131 After appellee filed her amended wrongful death action, but prior to trial, the legislature amended paragraph (5) of section 768.28 by enacting chapter 87-134, Laws of Florida, which became law on June 30, 1987. Sections 3 and 5 of Chapter 87-134 contained the following pertinent provisions:
Notwithstanding the limited waiver of sovereign immunity provided herein, the state or an agency or subdivision thereof may agree, within the limits of insurance coverage provided, to settle a claim made or a judgment rendered against it without further action by the Legislature, but the state or agency or subdivision thereof shall not be deemed to have waived any defense of sovereign immunity or to have increased the limits of its liability as a result of its obtaining insurance coverage for tortious acts in excess of the $100,000 or $200,000 waiver provided above.
... .
This act shall take effect upon becoming a law and shall apply to all causes of action then pending or thereafter filed, but shall not apply to any cause of action to which a final judgment has been rendered or in which the jury has returned a verdict unless such judgment or verdict has been or shall be reversed.
The obvious intent and apparent effect of the amendment was to abrogate the holding in Avallone and to limit the liability of the state, its agencies or subdivisions, to the maximum of $100,000/$200,000 as provided in section 768.28(5), regardless of whether the state or such agencies or subdivisions carried liability insurance in excess of those amounts.
The trial court, at the request of appellee, ruled that the amendment could not be constitutionally applied to this action against appellant, even though the action was pending as of June 30, 1987, the effective date of the amendment to section 768.28. The trial court held: "Chapter 87-134, Laws of Florida, cannot be retroactively applied to violate Plaintiff's vested rights, in that Plaintiff's cause of action had accrued and the litigation commenced prior to the law's effective date." After rejecting the applicability of section 768.28(5) as amended, the trial court held that the rule established in Avallone would apply to the collectability of any judgment entered against appellant.
We agree with the ruling of the trial court on the basis of the general principle that retroactive legislation is constitutionally invalid if it impairs a vested right. Young v. Altenhaus, 472 So.2d 1152 (Fla. 1985). The issue is therefore whether appellee, after suit was filed but prior to a judgment or verdict, had a vested property right to seek to collect by suit and judgment up to $1,000,000 in damages from appellant.
Appellant argues that a vested right is something more than a mere expectation of recovery, and until appellee had a judgment or jury verdict in hand, she had nothing more than a mere expectation of recovering damages.
We agree with appellee that application of section 768.28(5), Florida Statutes (1987), to limit the collectability of any judgment appellee might obtain would be an unconstitutional abrogation of appellee's right to full tort recovery. To explain our reasoning, however, requires us to address two apparently divergent but, we believe, distinguishable lines of cases from our supreme court that on their face seem to place different, and neither distinguished nor harmonized, interpretations on what constitutes a "vested" right in a tort claim for damages.
Appellant relies on Clausell v. Hobart Corp., 515 So.2d 1275 (Fla. 1987), cert. denied, ___ U.S. ___, 108 S.Ct. 1459, 99 L.Ed.2d 690 (1988), for the principle that there is no vested right in a tort cause of action for damages that has not been the subject of a jury verdict or reduced to judgment. Our colleagues on the fifth district in Marion County School Board v. Streetman, 535 So.2d 299 (Fla. 5th DCA 1988), relied upon Clausell to apply chapter 87-134 retroactively to the date of injury and limit the amount an injured party may recover to the limits stated in section 768.28, rather than to the extent of insurance *132 coverage. Although there are no facts stated in Streetman, it appears that our conclusions here put us in conflict with Streetman.
We reach our conclusions in conflict with Streetman first because we can distinguish Clausell on the grounds that Clausell dealt with the abolition of the statute of repose in product liability cases. Clausell was therefore not concerned with the abolition of, or the interference with, the right of full recovery for an existing cause of action, but with a limitations defense to the right to pursue a cause of action. Statutes of limitations do not destroy or diminish causes of action, but provide limitations only upon the time within which an injured party may seek to enforce and recover full compensation for such causes of action. On the other hand, section 768.28(5), Florida Statute (1987), as amended, seeks to take away a pre-existing right to seek full recovery for a cause of action that continues to exist. In this case, on June 29, 1987, appellee had an action pending against a political subdivision of the state in which she could recover up to $1,000,000. However, on June 30, 1987, the State of Florida, on behalf of itself and its political subdivisions, through an act of its legislature, reduced appellee's right to recover on her pending lawsuit from $1,000,000 to $100,000. There seems to us to be something basically unfair about allowing the state to reduce its exposure for damages after the incident causing the damage has occurred and action has been filed to recover those damages.
After careful analysis of the cases relied upon by Clausell, we believe that there is further justification to find Clausell inapplicable to the circumstances of this case. The cases cited as authority in Clausell are not authority for the position that a state, once a cause of action in tort has accrued and suit commenced, may abolish or diminish the claimant's right to be fully compensated for damages incurred. Neither is Clausell itself authority for such a position. In Logan v. Zimmerman Brush Co., 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982), the issue was whether the state would violate the claimant's federal constitutional due process rights if it terminated the claimant's cause of action under state law for claimant's failure to comply with previously existing statutorily mandated procedures. In deciding the issue, the Supreme Court discussed a claimant's "property" rights in a cause of action, and stated that "the Fourteenth Amendment's Due Process Clause has been interpreted as preventing the States from denying potential litigants use of established adjudicatory procedures, when such an action would be `the equivalent of denying them an opportunity to be heard upon their claimed right[s].' Boddie v. Connecticut, 401 U.S. 371, 380, 28 L.Ed.2d 113, 91 S.Ct. 780 [787] (1971)." Zimmerman Brush Co., 455 U.S. at 429, 102 S.Ct. at 1154 (footnote omitted).
In Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978), the sole question before the Court was whether Congress could constitutionally supplant state remedies by enacting federal legislation governing liability for accidents resulting from the operation of private nuclear power plants licensed by the federal government. There was no issue in Duke Power Co. that pertained to any retroactive effect of such federal legislation on preexisting state remedies. The Court, in a footnote in Duke Power Co., cited cases which have held that there is no vested right in state remedies for causes of action that have not accrued when the subject matter of the litigation is later preempted by federal legislation. Duke Power Co., 438 U.S. at 87, 98 S.Ct. at 2638, 57 L.Ed.2d at 620. However, in regard to the specific question of whether the Due Process Clause requires that a newly enacted legislative scheme of remedies must duplicate previously existing remedies or provide a reasonable substitute remedy, the Court said: "However, we need not resolve this question here since the Price-Anderson Act does, in our view, provide a reasonably just substitute for the common-law or state tort law remedies it replaces." Duke Power Co., 438 U.S. at 88, 98 S.Ct. at 2638 (citations omitted).
*133 Similarly, while Ducharme v. Merrill-National Laboratories, 574 F.2d 1307 (5th Cir.1978), cert. denied, 439 U.S. 1002, 99 S.Ct. 612, 58 L.Ed.2d 677 (1978), held that a claimant had no vested right in any tort claim for damages under state law, it did so only in the context of the federal Swine Flu Act that preempted existing state remedies pertaining to the subject matter. Ducharme did not involve the abrogation of accrued causes of action under state law. The Ducharme court specifically observed that "[p]laintiffs' cause of action against the manufacturer did not arise until after passage of the Swine Flu Act. Plaintiffs had no prior vested right in a cause of action under Louisiana Civil Code Article 2315." Ducharme, 574 F.2d at 1310. Moreover, the Ducharme court found that "[t]he cause of action provided by the Swine Flu Act to an injured person against the United States is substantially the same as that afforded against the manufacturer under Louisiana Civil Code Article 2315 except that under the Swine Flu Act no trial by jury is afforded and the plaintiff is required to seek first administrative review of his claim." Ducharme, 574 F.2d at 1309.
We therefore conclude that the vesting of the right to full recovery of an existing cause of action is more properly determined by Rupp v. Bryant, 417 So.2d 658 (Fla. 1982), State, Department of Transportation v. Knowles, 402 So.2d 1155 (Fla. 1981) (Knowles II), and Griffin v. City of Quincy, 410 So.2d 170 (Fla. 1st DCA 1982), pet. for review denied, 434 So.2d 887 (Fla. 1983).
In Rupp, the plaintiffs in the trial court, the Bryants, had filed suit for negligence against the School Board of Duval County and its employees, Rupp and Stasco. The Bryants' complaint had been filed on February 9, 1979, and was pending when the 1980 amendments to section 768.28, Florida Statutes (1979) became effective on June 30, 1980. The effect of those amendments was to grant immunity from suit to state agents for ordinary negligence committed within the scope of their duties and, as did the amendment we consider in the case before us, attempted to apply that immunity to all cases pending as of the effective date of the amendment. The trial court applied the immunity amendment and dismissed the Bryants' complaint with prejudice for failure to state a cause of action against Rupp and Stasco. The First District Court of Appeal reversed the trial court, finding the 1980 amendments to section 768.28 unconstitutional as a retroactive destruction of the vested rights of the Bryants to sue Rupp and Stasco. Bryant v. School Board of Duval County, Florida, 399 So.2d 417 (Fla. 1st DCA 1981). The supreme court in affirming the first district on that issue held as follows:
The Bryants prior to the 1980 amendments thus had the right to seek recovery from both Rupp and Stasco since neither defendant could assert immunity. The amendments plainly abolished this right retroactively. Based on due process considerations expressed in Village of El Portal v. City of Miami Shores, 362 So.2d 275 (Fla. 1978), and McCord v. Smith, 43 So.2d 704 (Fla. 1949), which prohibit retroactive abolition of vested rights, we agree with the district court that section 768.28(9), Florida Statutes (Supp. 1980), is unconstitutional insofar as it abolishes the Bryants' right to recover from Rupp and Stasco. Under similar circumstances, we recently held that those same 1980 amendments could not constitutionally affect a non-final jury award, and any reduction of the award was an impermissible, retroactive law. State, Department of Transportation v. Knowles, 402 So.2d 1155 (Fla. 1981). Although the Bryants have not proceeded as far in the litigation process, we apply the reasoning in Knowles to reach the same conclusion that the 1980 amendments may not be applied retroactively in this case.
... .
In conclusion, we find that appellants Rupp and Stasco are not entitled to assert immunity as public officials or employees under these circumstances, that the legislature's attempt to shield these employees from personal tort liability by retroactive application of section 768.28(9), *134 Florida Statutes (Supp. 1980), is unconstitutional as violative of due process, that the Bryants have successfully stated a cause of action in negligence against all the appellants, but have failed to state a cause of action against the employees for wanton and willful negligence.
Rupp, 417 So.2d at 665-666, 670 (footnotes omitted).
In Knowles II, relied upon in the Rupp decision, the supreme court again had before it that "familiar friend  section 768.28, Florida Statutes (1977), which waives sovereign immunity." Knowles II, 402 So.2d at 1156. The legislature in 1980, (just as it did in 1987, in regard to Avallone) had amended section 768.28 specifically to change the result of the supreme court's holding in District School Board of Lake County v. Talmadge, 381 So.2d 698 (Fla. 1980). The Talmadge court held that public employees were partially indemnified but not immunized from suit for injuries they inflict in the course of their employment. The 1980 amendment to section 768.28, chapter 80-271, Laws of Florida, provided absolute immunity to such public employees and attempted to give that immunity partial retroactive effect by making it applicable to all lawsuits then pending in trial or appellate courts. The plaintiff in the Knowles cases had obtained a jury verdict for $70,000 against the Department of Transportation and one of its employees. While that case was on appeal to this court, chapter 80-271 became effective. This court refused to apply the amendment retroactively to Knowles, holding that to do so would unconstitutionally eliminate Knowles' vested right to sue. State, Department of Transportation v. Knowles, 388 So.2d 1045, 1048 (Fla. 2d DCA 1980) (Knowles I). Because the supreme court in affirming this court spoke so clearly about a complainant's vested right to "full tort recovery," we feel constrained to quote at length from Knowles II:
The question, then, boils down to whether the legislature can do what courts so often do  that is, make a prospective determination of law applicable to persons who are "in the pipeline" because they are already litigating in that very subject area. To determine whether that problem implicates the maxim that retroactive legislation may not impair vested rights, we need first investigate whether Knowles had a "vested" right of some sort  a right to sue Gregg (as the district court said), a right to full recompense for his injuries, or a right to the jury's award. That investigation can best be launched by considering the change in Knowles' position which a retroactive application of the 1980 statute would engender.
Before the statute was passed, Knowles had a jury award for $70,000 against both the Department of Transportation and Gregg. The department's liability limit was $50,000, of course, but under existing law at the time of Knowles' injury (as Talmadge defined it) he had both the right to the entry of a judgment against Gregg and the right to satisfaction of the $20,000 balance of his judgment from Gregg. After the enactment of chapter 80-271, if the position of the department and the attorney general is upheld, Knowles would have only a $50,000 judgment against the department. The detriment to Knowles from an application of the 1980 change would be his loss of the ability to be recompensed fully for the injuries occasioned by Gregg's negligence, measured here by the jury at $20,000 more than the state by waiver has agreed to provide.
This analysis simplifies the "vested right" question by eliminating any dispute about "causes of action," and against whom they may be enforced. Knowles' right to sue Gregg had been replaced by a jury's determination both that Gregg was liable to Knowles for injuries, and that the damages suffered by Knowles were $70,000. As a matter of principle, it is indisputable that a retroactive application of the 1980 law has taken from Knowles something of value, and that nothing of value has been substituted or otherwise provided.
Under due process considerations, a retroactive abrogation of value has generally been deemed impermissible. *135 Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935); Bell v. Isthmian Lines, Inc., 363 F. Supp. 156 (M.D.Fla. 1973); McCord v. Smith, 43 So.2d 704 (Fla. 1949). The rule is not absolute, however, and courts have used a weighing process to balance the considerations permitting or prohibiting an abrogation of value. Despite formulations hinging on categories such as "vested rights" or "remedies," it has been suggested that the weighing process by which courts in fact decide whether to sustain the retroactive application of a statute involves three considerations: the strength of the public interest served by the statute, the extent to which the right affected is abrogated, and the nature of the right affected. That analysis is helpful here. Without discoursing unduly on the point, we readily conclude that the balancing of these factors favors Knowles. The statute effects an abrogation of Knowles' right to his full tort recovery, not merely a procedural adjustment of his remedies. That abrogation clearly outweighs the public's interest in the 1980 legislation.
Quoting Mr. Justice Holmes in Forbes Pioneer Boat Line v. Board of Commissioners, 258 U.S. 338, 339, 42 S.Ct. 325, [325] 66 L.Ed. 647 (1922):
Stripped of conciliatory phrases the question is whether a state legislature can take away from a private party a right to recover money that is due when the act is passed.
We hold, as in Forbes, that it cannot.
Knowles II, 402 So.2d at 1157-1159 (footnotes omitted).
Similarly, in Griffin, the first district refused to apply section 768.28 as it existed at the time judgment was entered rather than as it existed at the time the cause of action accrued. The court there held that "[r]etrospective application of the statute would adversely affect appellant's right to recover the policy limits of the City's insurance, which right vested when appellant suffered the injury." Griffin, 410 So.2d at 173.
We reach the same result. Using the balancing factors of Knowles II, we conclude that the balancing of those factors favors appellee, and as in Griffin, retrospective application of the statute would adversely affect appellee's vested right to recover the policy limits of appellant city's insurance.
We acknowledge that we have spent considerable time, effort and space discussing and resolving an issue that applies to the collectability of any judgment appellee may hereafter acquire inasmuch as we are reversing and remanding for a new trial. We believe this issue to be of sufficient importance that we should resolve it because the trial court may again be required to address it upon retrial after remand.
We now turn to the issue that requires us to reverse and remand for a new trial.
Appellant argues that the trial court erred when it directed a verdict on the issue of comparative negligence and that it compounded that error when it refused to give appellant's requested jury instruction on the justifiable use of force as defined in section 776.05, Florida Statutes (1985). We agree. Appellant specifically pled the defense of comparative negligence, alleging that Allen failed to exercise due care for his own safety during the incident that led to his injury and subsequent death. He was further alleged to have been negligent in the execution of the search warrant by placing himself and others in a situation of unreasonable risk of harm.
On the final day of the jury trial below, appellee moved for a directed verdict against appellant on its defense of comparative negligence, relying upon what we determine was a misapplication of Mazzilli v. Doud, 485 So.2d 477 (Fla. 3d DCA 1986). Mazzilli held that comparative negligence cannot be used as a defense to an intentional tort. By making this motion, appellee injected into this theretofore simple negligence case the question of whether Clouse had committed an intentional tort. The trial judge nevertheless accepted appellee's application of Mazzilli and granted the motion. The trial judge also determined that it was not proper in a civil case to give the *136 defense requested jury instruction on the justifiable use of force standard established in section 776.05, Florida Statutes (1987). For the following reasons, we find that when the trial court entered a directed verdict on the issue of comparative negligence, the court ruled on a question of fact, whether Clouse had committed an intentional tort, that should have been submitted to the jury if the issue was properly interjected at that point in the case. We also conclude that the instruction on justifiable use of force not only should have been given, but that the failure to do so may have been prejudicial to appellant.
We do not find it necessary to discuss the specific facts that may or may not have demonstrated comparative negligence on the part of Allen. Suffice it to state that there was sufficient evidence upon which the jury could have made a finding of Allen's comparative negligence if they had been properly instructed. Appellee, relying on Mazzilli, argued that because the act of shooting his shotgun down the hall of the house where Allen was located was an intentional act on the part of Clouse (appellant's employee), the defense of comparative negligence was not available. This argument misconstrues the legal meaning of intent and the holding of Mazzilli.
Mazzilli was an action alleging negligence and civil rights violations that was brought by drug enforcement agents, Mazzilli and Story, who were shot by a city police officer (Doud). The jury specifically found that Doud committed an assault and battery upon Mazzilli and Story, and that he negligently caused their resulting injuries. The jury found that Story was thirty-five percent negligent, but the trial judge refused to reduce the amount of the jury verdict by that thirty-five percent. The Third District Court of Appeal in Mazzilli affirmed the trial judge on his refusal to reduce the verdict specifically on the basis that the jury had found that Doud, in addition to being negligent, committed an assault and battery on Story. The Mazzilli court, citing Deane v. Johnston, 104 So.2d 3 (Fla. 1958) and Honeywell, Inc. v. Trend Coin Co., 449 So.2d 876 (Fla. 3d DCA 1984), held that inasmuch as contributory negligence did not bar recovery for a tort legally classified as intentional, neither does comparative negligence operate as a defense to such an intentional tort. However, not only do the circumstances surrounding the shooting in Mazzilli differ greatly from the circumstances surrounding the shooting here but, unlike this case, Mazzilli was a personal injury case in which the complaint alleged, the defendant was tried for and the jury specifically found, that the defendant had committed the intentional tort of assault and battery. The case before us was pled as a wrongful death action based on simple negligence. No intentional tort was alleged and the intentional tort question was never allowed to reach the jury.
First, unlike Mazzilli, this case was pled as a simple negligence case. Appellee here did not allege that Clouse had committed an intentional tort. The intentional tort issue was not a part of the case until appellee moved for a directed verdict on comparative negligence. We are not persuaded by appellee's argument that, since the evidence of intentional tort was entered without objection, the intentional tort issue was deemed tried by implied consent. It could not be deemed tried because it never reached the jury. In any event, the alleged evidence of intentional tort falls short of proving an intentional tort. Unlike the facts in Mazzilli that clearly show an intentional tort, the facts here are not so clear.
The facts of Mazzilli show that Mazzilli, Story and six other agents of the Drug Enforcement Administration were attempting to serve an arrest warrant on a suspected cocaine dealer in the City of Hialeah. Story, Mazzilli and other agents had stopped the suspect's vehicle in an intersection, and Story and Mazzilli had identified themselves and told the suspect he was under arrest when gunfire came from the suspect's vehicle. Story, Mazzilli and other agents returned fire. When City of Hialeah Police Officer Doud, uniformed and in a marked car on routine patrol, appeared and heard gunfire, he got out of his vehicle, service revolver in hand. He admitted *137 at trial that he did not know who was there, but believed that someone was committing a felony. As Story reached inside the suspect's vehicle to subdue him, one of the vehicle's occupants shot Story in the hip. As Story fell, he saw Doud's weapon "light up" and felt a gunshot to his side. Story testified that he threw his hands out and yelled to Doud, "Police  don't shoot," but Doud fired again, hitting the pavement. Story's gun was on the ground eight feet away. Doud then shot Mazzilli in the back as Mazzilli attempted to flee the scene. Although Doud claimed that Mazzilli had turned a weapon on him, Mazzilli testified that he never turned towards Doud.
The Mazzilli court, holding that the comparative negligence defense was unavailable to Doud because of the jury verdict of assault and battery, noted that since Doud indisputably intended to shoot Mazzilli and Story, he was properly found liable for battery which requires an intent to bring about a harmful or offensive contact. Mazzilli, 485 So.2d at 477, 480 n. 2. Clouse had no such indisputable intent here to shoot Allen. While Clouse admitted he intentionally fired his shotgun at an unknown target, it was clear from his testimony that he did not intend to shoot Allen. It is of significance that the supreme court in Deane, relied upon by the Mazzilli court, specifically held regarding an intentional tort that will suffice to negate a contributory negligence defense: "Intent in the law of torts means that the actor acts for the purpose of causing an invasion of another's interest or knows that such an invasion is resulting, or is substantially certain to result, from his conduct. It is not enough that the act itself is intentionally done." Deane, 104 So.2d at 8. Moreover, his testimony was such that the jury could have found that he was legitimately attempting to assist in the arrest of another person whom he perceived to be a fleeing felon. Since Clouse did not intend to shoot Allen, the appellee here, unlike the appellee in Mazzilli, had to rely upon a transferred intent to argue successfully an assault and battery by Clouse upon Allen.
However, before there can be a transferred intent to commit an intentional tort, the original intent with which the act is committed must be wrongful. It then becomes important to determine whether an act that might be wrongful under normal circumstances becomes justified under the circumstances facing the person committing the act. In this case, we conclude that although the firing of his shotgun was an intentional act on the part of Clouse, if his act though intentional was justifiable, it is removed from the "intentional tort" category. In order to have been able to properly make that determination, if the issue had been properly before them, the jury should have been instructed on the standard for determining the justifiable use of force by a law enforcement officer and the court should have submitted the issue of Allen's comparative negligence to the jury. Appellee's motion for a directed verdict on the comparative negligence issue effectively removed the issue of justification from the jury's consideration and necessarily placed the trial judge in the position of ruling as a matter of law as to whether Clouse's act was justified.
Although reckless or wanton conduct may also bar the defense of contributory negligence (Deane, 104 So.2d at 9), appellee here did not plead reckless or wanton conduct, but based her entire cause of action on simple negligence.
The discussion of the principles of law regarding intentional torts and transferred intent in W.L. Prosser, The Law of Torts, (4th Ed. 1971), has particular applicability to the issue of the availability of the defense of comparative negligence in the case here. In section 8 of W.L. Prosser's The Law of Torts, there is a discussion of the "Meaning of Intent." The following portions of that discussion are pertinent:
The intent with which tort liability is concerned is not necessarily a hostile intent, or a desire to do any harm. Rather it is an intent to bring about a result which will invade the interests of another in a way that the law will not sanction. ...
... To result in liability, the defendant's act must be a voluntary one. But a voluntary act, reduced to its lowest *138 terms, is a contraction of the muscles, and nothing else... . Its legal character must depend upon the actor's surroundings, and his state of mind with respect to them... .
Intent, however, is broader than a desire to bring about physical results. It must extend not only to those consequences which are desired, but also to those which the actor believes are substantially certain to follow from what he does... . The practical application of this principle has meant that where a reasonable man in the defendant's position would believe that a particular result was substantially certain to follow, he will be dealt with by the jury, or even by the court, as though he had intended it... .
On the other hand, the mere knowledge and appreciation of a risk, short of substantial certainty, is not the equivalent of intent. The defendant who acts in the belief or consciousness that he is causing an appreciable risk of harm to another may be negligent, and if the risk is great his conduct may be characterized as reckless or wanton, but it is not classed as an intentional wrong. In such cases the distinction between intent and negligence obviously is a matter of degree. Apparently the line has been drawn by the courts at the point where the known danger ceases to be only a foreseeable risk which a reasonable man would avoid, and becomes a substantial certainty.
"Transferred" Intent
One definite area in which there is more extensive liability for intent than for negligence is that covered by the curious surviving fiction of "transferred intent." If the defendant shoots or strikes at A, intending to wound or kill him, and unforeseeably hits B instead, he is held liable to B for an intentional tort. The intent to commit a battery upon A is pieced together with the resulting injury to B; it is "transferred" from A to B. "The intention follows the bullet."
... His act is characterized as "wrongful," and his fault is regarded as absolute toward all the world, rather than relative to any one person. Having departed from the social standard of conduct, he is liable for the harm which follows from his act, although he did not intend it.
W.L. Prosser, The Law of Torts, at 31-33 (4th ed. 1971) (footnotes omitted; emphasis supplied).
Finally, Prosser tells us that in order to subject a defendant to liability for a battery, the act of the defendant must cause and be intended to cause an unpermitted contact. Mere negligence, or even recklessness, which creates only a risk that the contact will result, is not enough to constitute battery. Prosser at 35. Thus, if Clouse's action was justifiable, the original intent here was not wrongful, no intentional tort was committed and there would be no wrongful intent to be transferred.
The analysis that we have rather exhaustively gone through forces us to the conclusion that the actions of Clouse, and any justification for them, and the acts of Allen, were so inextricably intertwined that it constituted prejudicial error for the trial judge to remove from the jury the issue of Allen's comparative negligence. As a necessary follow-up to that conclusion, we must also conclude that the jury should have been instructed on the standard for determining the justifiable use of force as set forth in section 776.05, Florida Statutes (1985). This court recognized the propriety of the use in a civil case of the standard established in section 776.05 in City of St. Petersburg v. Reed, 330 So.2d 256 (Fla. 2d DCA 1976). Such an instruction was apparently used in Mazzilli, 485 So.2d at 479.
Appellee urges us to remand only for a retrial on the issue of Allen's comparative negligence if we determine we must reverse on that issue. We have considered the propriety of such a limited retrial and determine that all issues in this case are too interwoven to make such a limited retrial appropriate.
We therefore reverse and remand for a new trial on all issues consistent with this opinion.
*139 THREADGILL, J., concurs.
PARKER, J., concurs in result only without opinion.