Katherine G. WOLFE and husband
John Eugene Wolfe

v.

MERRILL NATIONAL LABORATORIES,
INC., The William S. Merrill Company,
Richardson-Merrill, Inc., Merck, Sharp &
Dohme, Wyeth Laboratories, Inc., American Home Products Corporation, Parke-Davis & Company, Merck & Company,
Inc.

No. 77–2005–NE–CV.

United States District Court,
M. D. Tennessee,
Northeastern Division.

June 13, 1977.

Sidney W. Gilreath, Gilreath, Pryor & Rowland, Knoxville, Tenn., Robert R. Ramsey, Burnett, Ray & Ramsey, Jamestown, Tenn., for plaintiff.

Frederic D. Lamb, Vice President & Counsel, Merrill-National Laboratories, Div. of Richardson-Merrill, Inc., Cincinnati, Ohio, for defendant Merrill-National.

William B. Freilich, West Point, Pa., of counsel, Merck, Sharp & Dohme, Div. of Merck & Co., Inc., for defendant Merck, Sharp & Dohme.

Hedy M. Powell, Philadelphia, Pa., for defendant Wyeth Laboratories, Inc.

George M. Richards, Director, Litigation Section, Detroit, Mich., for defendant Parke-Davis & Company.

Neil R. Peterson, Asst. Chief, Torts Section, W. Russell Welsh, Trial Atty., John Marshall Meisburg, Jr., Civ. Div., U.S. Dept. of Justice, Washington, D.C., Charles H. Anderson, U.S. Atty., Nashville, Tenn., for the U.S.

## MEMORANDUM

MORTON, District Judge.

This action is presently before the court on the motion of the United States of America ("the Government") to have the court substitute it as the sole defendant and to dismiss the action for failure on plaintiff's part to exhaust her administrative remedies. Both motions are predicated on the express provisions of the National Swine Flu Immunization Program, P.L. 94–380, 94th Cong., August 12, 1976 ("the Act"), amending Section 317 of the Public Health Service Act (42 U.S.C. § 247b).

The plaintiff resists both motions, alleging alternatively that the Act permits a suit such as this directly against a drug manufacturer, that the Act is not applicable to the facts of this case, and that even if it were, the portion of it which limits her legal remedies to recovery under the provisions of the Federal Tort Claims Act ("the Tort Act") is unconstitutional.

In accordance with plaintiff's latter contention, she also seeks an injunction against further implementation of the Act.

Plaintiff,[1] a licensed physician in the state of Tennessee, allegedly contracted a disease known as Gillane-Barre paralysis subsequent to her alleged self-administration of swine flu vaccine manufactured by one of the drug companies named as defendants in her complaint. The vaccine had been prepared and distributed under the auspices of the National Swine Flu Immunization Program ("the Act"). The Act provides for written consent forms and procedures to assure that the risks of inoculation with the vaccine are fully explained to a prospective inoculee and that information respecting the inoculee's rights and remedies arising out of the administration of the vaccine is provided to him. Plaintiff alleges that she never signed any such forms (though she does not allege that she never saw or was unaware of such forms).

Plaintiff contends that her paralysis was a proximate result of her inoculation with swine flu vaccine, and that the defendant drug companies were negligent in testing the drug prior to its distribution and in failing to convey adequate warnings to the public as to the possibility of adverse reactions to the drug. Jurisdiction is alleged on the basis of diversity of citizenship.

Although the merits of this case are not presently before this court, certain facts are pertinent to the disposition of the Government's motions, and where relevant, such facts—as they appear in the present state of the record—will be alluded to.

The Swine Flu Immunization Program was the rather hurried Congressional response to what it perceived as "a potential national emergency of severe proportions."[2] During the Senate floor debates, Senator Javits, one of the Act's co-sponsors, explained the dilemma which confronted the legislators in dealing with the question of liability of program participants:[3]

> Unfortunately, the behavior of the insurance companies with respect to effectively preventing the vaccine to be made available to the American people has placed us in the tragic position of also having to create an alternative remedy for persons injured as a result of inoculation with the vaccine under the immunization program.[4]

In short, since the insurance companies had refused liability coverage to the drug manufacturers involved in the program, and since time for exploring alternative

---

1. Although plaintiff's husband joins her as party in this suit, reference to plaintiffs throughout this memorandum shall be in the singular.

2. Remarks of Sen. Taft during floor debate on Senate bill S. 3735. 122 Cong.Rec. 14110 (daily ed. Aug. 10, 1976).

3. "Program participants" are defined in the Act as "the manufacturer or distributor of the swine flu vaccine used in an inoculation under the swine flu program, the public or private agency or organization that provided an inoculation under the swine flu program without charge for such vaccine or its administration . . . and the medical and other health personnel who provided or assisted in providing an inoculation under the swine flu program without charge for such vaccine or its administration . . . ." 42 U.S.C. § 247b(k)(2)(B).

4. 122 Cong.Rec. 14108 (daily ed. Aug. 10, 1976).

measures was severely limited, Congress chose the rather innovative approach of channeling all personal injury claims by the program "casualties" through the administrative process of the Federal Tort Claims Act. The pertinent portion of the Act outlining this scheme is as follows:

.  .  .   all such claims will be asserted directly against the United States under section 1346(b) of title 28, United States Code, and chapter 171 of such title (relating to tort claims procedure) except as otherwise specifically provided in this subsection.

(2)(A) The United States shall be liable with respect to claims submitted after September 30, 1976 for personal injury or death arising out of the administration of swine flu vaccine under the swine flu program and based upon the act or omission of a program participant in the same manner and to the same extent as the United States would be liable in any other action brought against it under such section 1346(b) and chapter 171, except that—

(i) the liability of the United States arising out of the act or omission of a program participant may be based on any theory of liability that would govern an action against such program participant under the law of the place where the act or omission occurred, including negligence, strict liability in tort, and breach of warranty   .  .  ." [42 U.S.C. § 247b(k)(1)(B) and (k)(2), (4)]

Congress was careful to make the foregoing remedy the exclusive one for personal injury or death resulting from inoculation under the program:

(3) The remedy against the United States prescribed by paragraph (2) of this subsection for personal injury or death arising out of the administration of the swine flu vaccine under the swine flu program shall be exclusive of any other civil action or proceeding for such personal injury or death against any employee of the Government (as defined in section 2671 of Title 28,) or program participant whose act or omission gave arise to the claim.  [42 U.S.C. § 247b(k)(3)]

Upon the filing of the instant action against the defendant drug companies, the Government interceded, and, pursuant to 42 U.S.C. § 247b(k)(5)(A), the Attorney General (through his designate) certified that the suit arose out of an inoculation under the swine flu program.  In accordance with that certification, the Government now seeks substitution and dismissal.

The plaintiff's objections to the Government's motions will be addressed in the order in which they have been advanced.

■  Plaintiff asserts initially that the Act permits the maintenance of a suit for negligence directly against the drug manufacturers.  In support of this assertion plaintiff cites the "Congressional findings" section of the Act, 42 U.S.C. § 247b(k)(1)(A), wherein is recited the necessity "to protect such  .  .  .   organizations .  .  .   against liability for *other than their own negligence.*"  (emphasis supplied).  From this phrase plaintiff concludes that Congress' unmistakable intent was to permit common-law suits alleging negligent conduct on the part of drug manufacturers.  Such a conclusion rebels against logic, good sense, the unambiguous legislative history available, and the clear mandate of the statute itself.

■  As indicated by Senator Javits' remarks, quoted previously, the intractable position of the insurance companies made it impossible for the program to proceed without some form of guarantee to the drug manufacturers that they would be protected against multiple suits—predicated on negligence or otherwise—by individuals alleging injury from inoculation with the vaccine.  The obvious intent of Congress was to make the program operational as quickly as possible by removing completely this impediment.  This is aptly reflected in the remarks of Senator Beall during the floor debates.  *See* 122 Cong.Rec. 14113 (daily ed. Aug. 10, 1976).  To have thus shielded the manufacturers from all suits save those predicated upon the most obvious theory of recovery—negligence—would have been a patent absurdity.

Equally illustrative of the fallacy in plaintiff's contention is the language of the Act. The portion quoted by plaintiff is merely a statement of Congressional intent which has no imperative effect. Indeed, the phrase relied upon by plaintiff, standing by itself, is sufficiently ambiguous to require further examination of the Act in order to ascertain its intended meaning. That meaning is elucidated in a portion of the Act which imposes concrete, mandatory procedures:

> (7) Should payment be made by the United States to any claimant bringing a claim under this subsection, either by way of administrative settlement or court judgment, the United States shall have, notwithstanding any provision of State law, the right to recover for that portion of the damages so awarded or paid, as well as any costs of litigation, resulting from the failure of any program participant to carry out any obligation or responsibility assumed by it under a contract with the United States in connection with the program or from *any negligent conduct* on the part of any program participant in carrying out any obligation or responsibility in connection with the swine flu program. The United States may maintain such action against such program participant in the district court of the United States in which such program participant resides or has its principal place of business. 42 U.S.C. § 247b(k)(7) (emphasis added)

It thus is apparent that the reference to protection of program participants from liability "for other than their own negligence" suggests *not* a limitation upon their exemption from suit by an inoculee, but rather recognizes that they may be liable to the United States to the extent of any disbursements necessitated as a result of their negligence.

In addition, the operative portion of the Act wherein the specific liability of the United States is delineated unequivocally extends coverage to "claims . . . for personal injury or death" based upon *"any theory of liability . . . including negligence"* (emphasis added) 42 U.S.C. § 247b(k)(2)(A). Moreover, as mentioned previously, the remedy against the United States is made "exclusive of *any other civil action,*" 42 U.S.C. § 247b(k)(3), including, it is logical to assume, an action based on negligence. Plaintiff's first contention must, therefore, be rejected.

Plaintiff's second contention is that the Act is inapplicable to the facts out of which her injury arose. She appears to argue that the signing of an informed consent form is a *sine qua non* of the Act's operation, and that since she never signed such a form, her suit arises outside the Act's scope. In arriving at this conclusion, plaintiff focuses upon the Act's definition of "program participants," urging that the defendant drug companies have somehow lost their status as program participants as a result of her failure to subscribe to an informed consent form. Such a conclusion unfortunately reflects a serious misreading of the plain language of the Act. The pertinent provision is as follows:

> (B) For purposes of this subsection, the term "program participant" as to any particular claim means the manufacturer or distributor of the swine flu vaccine used in an inoculation under the swine flu program, the public or private agency or organization that provided an inoculation under the swine flu program without charge for such vaccine or its administration and in compliance with the informed consent form and procedures requirements prescribed pursuant to subparagraph (F) of paragraph (1) of this subsection, and the medical and other health personnel who provided or assisted in providing an inoculation under the swine flu program without charge for such vaccine or its administration and in compliance with such informed consent form and procedures requirements.

While it is arguable that program participant status may not be conferred on an "inoculating agency" or on "health personnel absent compliance with the prescribed informed consent procedures, it is clear that the Act exacts no such requirement of drug

manufacturers. All that is mandated is that it manufacture or distribute the vaccine used in an inoculation under the program. Although plaintiff does not appear to advance the argument that since she signed no consent form her inoculation did not occur "under the program," this court would find such a contention unpersuasive. It seems clear that *but for* the swine flu program, plaintiff would not have had access to the vaccine (except perhaps in a government-sanctioned experimental situation) and thus could not have inoculated herself. While her failure to sign a consent form may therefore affect the exempt status of some individuals (including, ironically, herself), it does not alter the fact that her inoculation did occur under—and in fact could not have occurred absent the existence of—the program. Plaintiff's second contention must therefore also be rejected.

■ Plaintiff raises two challenges to the validity of the Act itself. First, she claims that Congress has impermissibly delegated to the United States the legal duty of drug manufacturers through the mechanism of the Federal Tort Claims Act. Since the Tort Act extends coverage only to federal employees, she argues, Congress has overstepped its bounds in bringing non-employee pharmaceutical companies into its reach. This casuistic argument ignores two very obvious facts. First, it was Congress which enacted the Tort Act in the first place and it is perfectly within Congress' power to amend that act in whatever manner—consonant with Constitutional principles—it deems appropriate. However, it is not even necessary to reach that issue since the Swine Flu Act does not seek, as plaintiff erroneously suggests, to turn drug companies into government employees, but merely appropriates the procedures of a statute applicable to government employees (the Tort Act) for disposing of claims arising under the Swine Flu Act. The effect is precisely the same as if the Tort Act had never existed and Congress had created for the first time procedures applicable solely to claimants under the Swine Flu Program during the passage of that act. Plaintiff's first challenge to the Act's validity must, therefore, be rejected.

■ Plaintiff's second challenge attacks the constitutionality of the Act. In particular, plaintiff contends that the Act denies her a right to a jury trial as guaranteed by the Seventh Amendment, that her right to due process and (by implication) equal protection under the Fifth Amendment has been abridged, and that the Act represents an impermissible incursion into matters properly reserved to the individual states, in derogation of the Tenth Amendment.

The Government has responded at considerable length to each of the constitutional issues asserted by plaintiff, and has, in this court's estimation, rebutted them with persuasive force. While it might prove enlightening at this juncture to explore those issues in some detail, this court finds it unnecessary to do so for two reasons. First, the constitutional issues raised by plaintiff mirror with exactitude those alleged in a factually identical case recently decided in the District Court for the Western District of Oklahoma.[5] In that case, Senior District Judge Luther Bohanon rejected each of the plaintiff's constitutional challenges to the Swine Flu Act and granted the Government's motions for substitution and dismissal. To the extent that it is necessary to reach the issues raised by plaintiff, this court adopts and incorporates the reasoning and result of Judge Bohanon's decision. However, while subscribing to the rejection of plaintiff's arguments, assuming them to be pertinent, this court is of the opinion that the premise upon which they are necessarily predicated is itself erroneous. It is upon this basis that the court concludes that plaintiff has failed to raise a legitimate constitutional objection to the Act.

---

**5.** *Sparks v. Wyeth Laboratories, Inc., et al.,* 431 F.Supp. 411 (filed May 13, 1977). A summary of the case is reported at 45 U.S.L.W. 2576 (June 7, 1977). In fact, not only are the issues identical, but it appears that the legal arguments advanced in the pleadings and briefs in each case correspond for the most part virtually verbatim.

Plaintiff's "unarticulated major premise" is that her alleged constitutional deprivations arise from a coercive legislative scheme under which she is compelled to suffer grievous losses against her will. In fact, nothing could be further from the truth. The cornerstone of the Act is the *voluntary* cooperation of the general populace in participating in the program only after becoming acquainted with its conditions via the consent form. In this regard, it is of little help to plaintiff's case that she never signed a consent form, inasmuch as she was a licensed physician who, of all persons, should certainly have been familiar with the basic provisions of the program. Indeed, as one entrusted with access to and administration of the vaccine, it was her *duty* to appreciate the importance and understand the conditions of the informed consent form. At any rate, her own failure to sign a consent form in no way affects the fact that the program itself was designed to be, and was in practice, totally voluntary and dependent upon the uncoerced cooperation of the citizenry. This fact is reflected in the legislative history of the Act:

> So individuals have to make up their minds based upon what I have said and the assurances of the scientists and the Federal Government that this is a good and desirable thing as a national action on the part of the United States.

> But I must again repeat what is clear in the legislation: that the fact that we have prepared the vaccine, that the United States has caused it to be paid for, that administering means have been established, that the Government thinks this is a very desirable thing to do and believes the evidence justifies the precaution *is in no way a compulsion on any American*, the individual American, who still has to give his voluntary and informed consent . . . [Remarks of Sen. Javits, 122 Cong.Rec. 14109 (daily ed. Aug. 10, 1976)]

> . . . I would express the personal hope that citizens, in their own interests and in the interests of patriotism for the whole country, would seriously and affirmatively consider entering into the program. *But there is no element of mandate, force, or constraint of any kind.* [Id. at 14118] (emphasis added throughout)

Having thus established the volitional nature of the Act, it becomes apparent that what it in effect provides is not a mandatory constriction of personal liberties or constitutional guarantees, but a *grant*, available to every individual, and which may be freely rejected by anyone, or accepted, *subject to its terms.*

It is in this respect not unlike a private contract between the Government and an inoculee, wherein the latter accepts the putative benefit of immunization from swine flu in return for a promise to pursue any remedies for resulting injury through channels prescribed by the Government. The consent form procedures may be viewed as tacit recognition of this conceptualization by Congress, the inoculee's signature serving to memorialize the "contract." As indicated previously, plaintiff's failure to sign a consent form does not invalidate her obligations under such an "agreement;" it merely requires that evidence of her understanding of its terms be found elsewhere—in this case in her status as a physician and potential program participant.

While the contract analogy is helpful in illustrating the quid pro quo nature of the program, it is by no means necessary to the result which the facts of this case dictate. Well established constitutional principles lead ineluctably to the same conclusion.

■ It is a simple and well accepted tenet of constitutional law that eligibility for a federally funded grant created pursuant to Congressional enactment may be made dependent upon adherence to and observance of the conditions and limitations under which the funds or benefits are made available. *See, e. g., United States v. San Francisco*, 310 U.S. 16, 60 S.Ct. 749, 84 L.Ed. 1050 (1939); *United States v. Appalachian Electric Power Co.*, 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243 (1940); *Oklahoma v. United States Civil Serv. Comm.*, 330 U.S. 127, 67 S.Ct. 544, 91 L.Ed. 794 (1946); *Rosado v.*

*Wyman,* 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970); *Townsend v. Swank,* 404 U.S. 282, 92 S.Ct. 502, 30 L.Ed.2d 448 (1971); *Lau v. Nichols,* 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974).

While most of the cases cited above concern federal grants to state or municipal agencies, the principle is no less valid when the recipient happens to be, as in the instant case, a private entity. Such is the teaching of *United States v. Appalachian Electric Power Co., supra,* wherein the Court recognized that the grant of a license by the Federal Power Commission for construction of a dam on a navigable waterway by a private power company might be conditioned on whatever terms the Commission chose to exact.

■ It is equally clear that one cannot accept and retain the benefits conferred under a statute, as plaintiff has done in the instant case, while assailing the constitutionality of one of its important conditions. *United States v. San Francisco, supra,* 310 U.S. at 29, 60 S.Ct. 749, and cases cited in footnote 22.

■ Thus in the instant case, where plaintiff voluntarily chose to accept the benefit of immunization with vaccine made available through a federally subsidized program, she is bound by the conditions to which the program was subject.

The only question of constitutional magnitude thus left to be dealt with is whether Congress had the power to enact a piece of legislation such as the Swine Flu Act. This does to an extent require consideration of some of the elements suggested by plaintiff's Tenth Amendment argument, although the focus here is, more appropriately, on Congress' Article I, § 8 powers.

■ Plaintiff's reliance on the Tenth Amendment as a basis for challenging the Act reflects her erroneous assumption that the function assumed thereunder by Congress is one of regulation rather than of spending. The foregoing discussion makes clear that, as a grant program, it is pursuant to the latter function that the Act operates. Accordingly, even if it were true,

as plaintiff incorrectly contends, that the purpose of the Act falls outside of those enumerated in Article I of the Constitution, that would not affect the Act's validity, since Congress' power to spend is not limited to its enumerated powers. *United States v. Butler,* 297 U.S. 1, 56 S.Ct. 312, 80 L.Ed. 477 (1935). All that is required is that the funds appropriated be expended for the "general welfare." *United States v. Butler, supra; Helvering v. Davis,* 301 U.S. 619, 57 S.Ct. 904, 81 L.Ed. 1307 (1937); *Antieau, II Modern Constitutional Law* §§ 12:56, 12:58 (1969). That condition is clearly met under the Swine Flu Act. It cannot be doubted, therefore, that Congress acted within its constitutionally ordained powers in passing the Act.

■ Based on the foregoing reasoning, plaintiff's request for an injunction must be denied and the Government's motion for substitution must be granted. Moreover, inasmuch as it appears undisputed that plaintiff has, in accordance with the provisions of the Federal Tort Claims Act [28 U.S.C. § 2675(a)], filed an administrative claim with the Department of Health, Education and Welfare, that her claim is still pending, and that six months have not elapsed since its filing, this court is without jurisdiction to hear her claim. *Ferreira v. United States,* 389 F.2d 191 (9th Cir.1968); *Walley v. United States,* 366 F.Supp. 268 (E.D. Pa.1973); *Franklin State Bank v. United States,* 423 F.Supp. 1 (S.D. N.Y. 1975). Accordingly, the Government's motion to dismiss must also be granted.

An appropriate order will be entered.